Ryan v. John Cudahy, A. W. Wright, R. W. Roloson, Walter L. Roloson, George F. Stone, Secretary, and Charles D. Hamill, President of the Board of Trade of Chicago, J. H. Norton, E. S. Worthington and "The Merchants Loan and Trust Co."

1. BOARD OF TRADE—*Its Corporate Powers.*—The board of trade of the city of Chicago is authorized to " make such rules, regulations and by-laws as it may think proper or necessary for its own government, not contrary to the laws of the land; to establish such rules, regulations and by-laws for the management of its business, and the mode in which it shall be transacted, as it may think proper, and appoint committees of reference and arbitration and committees of appeals, to be governed by such rules and regulations as may be prescribed in the rules, regulations or by-laws for the settlement of such matters of difference as may be voluntarily submitted for arbitration by members of the association or by other persons not members thereof. The chairman of either of said committees, when sitting as arbitrators, is authorized to administer oaths to the

Ryan v. Cudahy.

parties and witnesses, and issue subpœnas and attachments compelling the attendance of witnesses, the same as justices of the peace, and in like manner to direct the same to any constable to execute."

2. BOARD OF TRADE—*Committee of Arbitration—Judgment.*—When a committee of arbitration of the board of trade renders a final award upon a written submission, and no appeal is taken within the time fixed by the rules or by-laws of the board, such award may be filed with the clerk of the Circuit Court of Cook County, and shall be entered upon the judgment docket of said court.

3. BOARD OF TRADE—*Powers of Committee.*—If the committee of arbitration refuse to hear evidence offered by one of the parties, such refusal must be attributed to the fact that the evidence offered was not, in the opinion of the committee, relevant to the case on hearing, and the equity and justice of that judgment, the complaining party agreed in advance, having subscribed the by-laws on becoming a member, that he would not question.

4. BOARD OF TRADE—*Jurisdictional Powers.*—Within the range of its jurisdiction the power of the board of trade, through its lawfully constituted committees, is as complete, conclusive and exclusive in matters affecting property interests as in the discipline or deposition of its members.

5. BOARD OF TRADE—*Power to Govern Its Members.*—It was no doubt intended when these powers were granted that the corporation should have full power to govern its members, in all of their dealings with each other on the board. And the power was conferred that all such disputes might be speedily settled by its own tribunal without the delay and expense of litigation in the courts. Hence it was authorized to establish tribunals of its own to avoid litigation and for the prompt and speedy settlement of disputes among its members. One of the prime objects of its creation was to exercise this power.

6. BOARD OF TRADE—*Misfeasance of Arbitration Committee.*—If the committee act in the matters submitted to it, under rules and regulations, in contravention of the laws of the land, or act willfully in defiance of its own lawful rules, the aid of a court of chancery may be invoked to prevent mischief and fraud, but otherwise it has no power to interfere.

**Memorandum.**—In chancery. In the Superior Court of Cook County; the Hon. WILLIAM G. EWING, Judge, presiding. Appeal by complainant, from a decree dismissing his bill for want of equity. Heard in this court at the March term, A. D. 1893, and affirmed. Opinion filed June 29, 1893.

APPELLANT'S BRIEF, BARNUM, HUMPHREY & BARNUM, ATTORNEYS.

Upon the question of the jurisdiction of the court to interfere in such a case as this, we cite the following authorities:

Commonwealth ex rel. v. The Pike Beneficial Society, 8 Watts and Serg. 250; Commonwealth ex rel. v. The German Society, 15 Pa. St. 254; Society v. Commonwealth, 52 Pa. St. 133; Commonwealth v. The Pennsylvania Beneficial Institution, 2 Serg. and Rawle, 141; Labouchere v. Earl of Wharncliffe, L. R. 13 Chan. Div. 352; Fisher v. Keane, L. R. 11 Chan. Div. 353; Fisher v. Keane, 49 L. J. Ch. 14; Pitcher v. Board of Trade, 20 Brad. 319; Wood v. Wood, L. R. 9 Exch. 196, cited and approved in 20 Brad. 319; Pitcher v. Board of Trade, 121 Ill. 420; 2 High on Injunc. (3d Ed.) § 1194; High on Extr. Leg. Remedies, §§ 292, 293, 294, 295; Cooley's Const. Lim. 431, adopting Daniel Webster's definition of *Law* of the *Land:* "A law which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial." Otherwise, "judicial proceedings," says Judge Cooley, "can not be valid."

BRIEF OF A. W. GREEN, ATTORNEY FOR THE PRESIDENT AND SECRETARY OF THE BOARD OF TRADE, APPELLEES.

Even if the evidence offered was improperly rejected by the committee, still such action on the part of the committee gave no jurisdiction to a court of equity to interfere.

The charter of the board of trade of the city of Chicago confers the power to establish such rules, regulations and by-laws for the management of the business of the association and the mode in which it shall be transacted as they may think proper. Ryan, on becoming a member, agreed "to abide by the rules, regulations and by-laws of the association and all amendments that may be made thereto."

The charter and the rules of the board of trade of the city of Chicago have been under consideration in a number of cases. People ex rel. Page v. Chicago Board of Trade, 45 Ill. 112; Fisher v. Chicago Board of Trade, 80 Ill. 85; People ex rel. Rice v. Chicago Board of Trade, 80 Ill. 134; Baxter v. Chicago Board of Trade, 83 Ill. 146; Sturges v. Chicago Board of Trade, 86 Ill. 441; Wright v. Chicago Board of Trade, 15 Chicago Leg. News, 239; Pitcher v. Chicago Board of Trade, 121 Ill. 412.

W. J. Hynes, Francis A. Riddle and James L. High, attorneys for John Cudahy, A. W. Wright, R. W. Roloson, Walter L. Roloson, J. H. Norton and E. S. Worthington, appellees.

Opinion of the Court, Shepard, J.

This is an appeal from a decree sustaining the demurrers of the defendants and dismissing the bill for want of equity. The facts and law applicable thereto, are well stated in the opinion of the learned chancellor of the Superior Court, who entered the decree, and that opinion is adopted as the opinion of this court.    It is as follows:

Ewing, J.    The bill alleges that the complainant and all the defendants, except the Merchants Loan and Trust Company, are members of the Chicago board of trade; that from April to November, 1892, complainant and Cudahy and Wright were large buyers on said board, of short ribs, but that complainant's purchases had no connection with those of Wright and Cudahy or either of them; that the market advanced normally until about the middle of August, at which time complainant held 5,000,000 pounds of said commodity, which he had paid for, and then held in store in Chicago; that Cudahy, by various devices, led complainant to believe that he, Cudahy, was not in any way interested with Wright in any of his purchases of said product, or in the advance of the price thereof, and in the latter part of August deceitfully induced complainant to exchange his 5,000,000 pounds of cash ribs for a September option for a like quantity of ribs; that such cash ribs were delivered to Cudahy as an accommodation to him, and that they had no cuts or incisions in them when delivered; that large quantities of such ribs and other ribs, aggregating 15,000,000 pounds, were shipped by said Cudahy to various points in the south, and that before or after being shipped the same were, by Cudahy and Wright, cut, slit and mutilated for the purpose of rendering them undeliverable under the rules of the board, upon any contracts entered into upon said board; that, in fact, Cudahy and Wright were jointly

interested in all deals, of either of them, in ribs, on said board for September and October delivery, but that complainant did not learn such fact until October 31st; that by the misrepresentation and deceit of Cudahy, complainant was induced during August, September and October to sell in large quantities ribs for October delivery, and in consequence thereof was on October 31st, bound by divers contracts made on the board, to deliver on that day 1,450,000 pounds of ribs, which he could not do in whole or part, because the market was cornered by an unlawful combination of certain members of said board, including defendants Cudahy, Wright, Norton, Worthington and R. W. and W. L. Roloson; that the fair and legitimate price of ribs on October 31st, did not exceed seven and one-half cents à pound, but that the same were sold or pretendedly sold on said board on October 31st, under the influence of said corner, at twelve cents a pound, for the purpose of establishing twelve cents as the market price on the delivery day, and therefore the measure of damages on unfulfilled contracts for delivery on that day.

It is further alleged that among the sales of ribs for October delivery, which complainant was induced to make by the false and fraudulent representations of Cudahy, was one of 200,000 pounds, at $7.45 per hundred, and one of 200,000 pounds at $7.47½ per hundred, to defendants Norton & Worthington, and also 600,000 pounds at $7.60 per hundred, to defendants R. W. & W. L. Roloson, on account of which sales and failure to deliver, said purchasers respectively demand of complainants $18,150 and $26,400 as their damages, etc., such sums being the difference between the selling price of such ribs and said corner price; that such last named purchases were made by R. W. & W. L. Roloson and Norton & Worthington, as the agents of Cudahy and Wright, and that the damages demanded are in fact for Cudahy and Wright; that under a rule of the board, the complainant from time to time made margin deposits with the defendant, the Merchants Loan and Trust Company, on account of the sales last aforesaid; such deposits on account

of the sale to Roloson & Roloson, amounting to $26,500, evidenced by eleven certificates of deposit of said bank, and such deposits, on account of the sale to Norton & Worthington, amounting to $18,000, evidenced by ten certificates of deposit of said bank; that these certificates were issued in duplicate, the originals being delivered to complainant, and the duplicates thereof to the secretary of the board; that complainant and the defendants Norton & Worthington and R. W. & W. L. Roloson, failing to agree as to whom said margins belonged in whole or in part, in pursuance of notices given by defendants R. W. & W. L. Roloson, the president of the board appointed a committee of three, under sections 6 and 7 of rule 20, to decide the differences between complainant and the defendants R. W. & W. L. Roloson; that the complainant appeared before said committee, and in support of his contention in respect to said matters in dispute, offered to prove, by divers witnesses, the corner alleged in his bill, and to prove the fair and legitimate market value of short ribs on October 31st, and offered to prove by witnesses the value of such short ribs in other markets than Chicago, and their value for consumptive purposes in the Chicago market on that day; but that said committee wrongfully and in violation of rule 20, refused to hear such evidence, and decided that the margin deposit of $26,400 was payable to said Rolosons.  The bill further alleges that the decision of said committee was not based upon the fair and legitimate market value of said ribs in Chicago on October 31st, but upon a fictitious price of $12 per 100 pounds, produced fraudulently by said corner; that the president of said board would indorse said duplicate certificates in the custody of said defendant Stone, and the defendant bank would pay said margin deposit to the amount of $26,400 to said Rolosons, unless restrained, etc.   The bill contains no allegation of confederation or fraud on the part of the president and secretary of the board or of the committee.

To the bill the defendants severally demurred.

It is insisted by counsel for complainant, that this case is not subject to the reason of the rule established by numerous

decisions of our Supreme Court, respecting the power of chancery to supervise the administration of the rules of such organizations as the board of trade, because the corporation is not made a defendant to the bill; but the president and secretary of the board, in their capacity as such officers, are made defendants, and the purpose, or at least one purpose of the bill, is to restrain their acts as such officers, under the rules of the board, as construed by its lawfully constituted authorities, and thus have the court revise the board's administration of its own rules in respect to its own members. If this court could not grant the relief sought, if the board of trade were a party defendant to the bill, it certainly has no jurisdiction in a case where the effect of its decree upon the corporation would be precisely the same as if the corporation were a defendant. A court of chancery can not *finesse*, or reach by indirection or collaterally, that which it can not accomplish directly. The jurisdiction of a court of chancery in this case, if it exist at all, must be based on the court's power to supervise and direct the administration of the lawful rules of the board of trade.

The board of trade of the city of Chicago, by the act of its corporation is authorized and empowered, among other things, to "make such rules, regulations and by-laws from time to time as they may think proper or necessary for the government of the corporation hereby created, not contrary to the laws of the land."   *   *   *

"To establish such rules, regulations and by-laws for the management of their business, and the mode in which it shall be transacted, as they may think proper."

"To constitute and appoint committees of reference and arbitration, and committees of appeals, who shall be governed by such rules and regulations as may be prescribed in the rules, regulations or by-laws for the settlement of such matters of difference, as may be voluntarily submitted for arbitration by members of the association, or by other persons not members thereof; the acting chairman of either of said committees, when sitting as arbitrators, may administer oaths to the parties and witnesses, and issue subpœnas

Ryan v. Cudahy.

and attachments, compelling the attendance of witnesses, the same as justices of the peace, and in like manner directed to any constable to execute."

And the charter further provides, that when a committee of arbitration shall render a final award upon a written submission, and no appeal is taken within the time fixed by the rules or by-laws, that such award may be filed with the clerk of the Circuit Court, and shall be entered upon the judgment docket of said court.

By virtue of this authority, the board of trade adopted certain rules and by-laws which were in force at the time the complainant became a member of said organization, and have remained in force ever since. The preamble to these rules and by-laws declares that one of the objects of the association is "to facilitate the speedy adjustment of business disputes."

In section 10 of rule 4, among other things, it is provided that "in any investigation or trial before the board of directors, or before any other duly constituted committee, or other tribunal of the association, * * * no witness shall be compelled to answer any question which shall criminate himself; nor shall any testimony be admitted which, in the opinion of the committee, or other tribunal, is irrelevant to the case in hearing."

Section 1 of rule 20 provides that each person, before becoming a member of said board, shall sign "an agreement to abide by the rules, regulations and by-laws of the association, and all amendments that may be made thereto."

Section 1 of rule 20 in part provides that "on time contracts, purchasers shall have the right to require of sellers, as security, a deposit of ten (10) per cent, based upon the contract price of the property bought, and further security, from time to time, to the extent of any advance in the market value above said price. Sellers shall have the right to require as security from buyers a deposit of ten (10) per cent on the contract price of the property sold, and, in addition, any difference that may exist or occur between the estimated legitimate value of any such property and the price

of sale. All securities shall be deposited, either with the treasurer of the association or with some bank duly authorized by the board of directors to receive such deposits."

Sections 6 and 7 of rule 20 provide as follows:

" Sec. 6. Upon the fulfillment or settlement of any contract, or upon the closing of any contract under the provisions of section 5 of this rule, deposits upon which have been made, and when the full adjustment of all differences relating to the same shall have been effected, the deposits shall thereupon be payable to the party depositing the same, and the joint indorsement of both parties upon the certificate shall be a sufficient authority to the party holding the deposit to pay the same to the holder of the certificate; or in case of a failure between the contracting parties to adjust and settle their respective claims upon the deposit within three (3) business days after the maturity of all contracts, upon which the deposit is applicable, the matter in dispute shall, upon the application of either party to such contracts, be submitted to a select committee of three disinterested persons, members of the association, to be appointed by the president, which committee shall, without unnecessary delay, summon the parties before them, and hear such evidence under oath as either may wish to submit touching their claims to the deposit, and shall, by a majority vote, decide, and report to the president of the board, in writing, in what manner and to whom the deposit is payable, either wholly or in part; whereupon the president shall indorse on either the original or duplicate certificate, an order for the payment of such deposits, in accordance with the decision of said committee, and said order shall be a sufficient warrant to the party holding the deposit to pay the same in accordance with such order." ＊　＊　＊

" Sec. 7. In determining the value of property under this rule, its value in other markets, or for manufacturing or consumptive purposes in this market, together with such other facts as may justly enter in the determination of its value, shall be considered, irrespective of any fictitious price it may at the time be selling for in this market. Such value, for

the purposes of this rule, in case of disagreement, shall be determined by the board of directors, and communicated to the parties in interest through the president or secretary."

Rule 23 provides as follows:

"Sec. 1.   In case any property contracted for future delivery is not delivered at maturity of contract, the purchaser may, if he shall so elect, consider the contract forfeited; or he may purchase the property on the market for account of the seller, by 1:15 o'clock of the next business day, notifying him at once of such purchase, or he may require a settlement with the seller at the average market price on the day of maturity of contract, and any damage or loss due to the purchaser, by reason of such purchase or declared settlement, shall be due and payable by the seller immediately.

Sec. 2.   In case any property contracted for future delivery, is not received and paid for when properly tendered, it shall be the duty of the seller, in order to establish any claim on the purchaser, to sell it on the market at any time during the next twenty-four hours at his discretion, after such default shall have been made, notifying the purchaser within one hour of such sale, and any loss resulting to the seller shall be paid by the party in default."

These rules were all agreed to by the complainant when he became a member of the board, and were acquiesced in by him at every stage of the transactions recited in the bill, until the committee appointed to determine the ownership of the margin deposits, refused to hear evidence respecting the actual value of short ribs in other markets, or for consumptive purposes in the Chicago market on October 31st, and refused to be governed in its findings by the state of facts it is alleged such excluded evidence would have established.   The chancery powers of this court are now invoked to prevent the execution of the alleged illegal and unjust finding and award of that committee.

The complainant submitted his claim to the margin deposits, which are the subject-matter of this suit, to a tribunal of his own choosing—a tribunal authorized by law, and

clothed with full power and authority to hear and determine the matter in controversy; he agreed in advance how the court should be constituted, and that no testimony should be admitted, which in the opinion of his chosen tribunal, is irrelevant to the case in hearing. If the committee refused to hear evidence offered by the complainant, such refusal must be attributed to the fact that the evidence offered was not, in the opinion of that tribunal, relevant to the case on hearing, and the equity and justice of that judgment the complainant agreed in advance that he would not question.

It is claimed that this case is in principle unlike the cases passed upon by our Supreme Court and cited by counsel for defendants, because here money or property is involved, while in those cases the questions were of " discipline, policy or doctrine." Whatever the distinction in this respect may be, it must be conceded, that within the range of its jurisdiction the power of the board of trade, through its lawfully constituted tribunals, is as complete, conclusive and exclusive in matters affecting property interests as in the discipline or deposition of its members.

The board of trade is especially authorized to " establish such rules, regulations and by-laws for the management of their business and the mode in which it shall be transacted, as they may think proper." This certainly means more than discipline, policy or doctrine. The charter authorized the appointment by the board of committees of arbitration, " for the settlement of such differences as may be submitted for arbitration by members of the association and by other persons not members thereof." This does not mean for the settlement merely of questions of discipline, of policy, or of doctrine, because in such questions a person not a member of the association would have nothing to arbitrate. Moreover one of the declared purposes of the organization of the board of trade is, " to facilitate the speedy adjustment of business disputes," and such disputes are rarely respecting any other thing than values, money or property.

In People ex rel. Page v. The Board of Trade, 45 Ill. 112, the court says: " One of the objects for which the board of

Ryan v. Cudahy.

trade was created, undoubtedly was, to promote a high standard of commercial honor and credit in the city of Chicago, by securing among the members of the board a prompt discharge of their pecuniary obligations, contracted in their dealings with each other, without a resort to the expense and dilatory procedure of a court of law. In order to accomplish this, the charter authorizes the board to create within itself tribunals of reference and arbitration, by whose decision the members shall be bound."

In a decision of our Supreme Court, Wright v. The Board of Trade, decided March 29, 1893, Walker, J., 15 Chicago Legal News, page 239, the case is very like the one at bar. Complainants alleged that after they had sold large quantities of wheat for future delivery the officers and members of the board "cornered" the market, and thereby prevented the complainants from filling their contracts, and on their failure to do so "a committee was appointed to determine the price of wheat in the market on the day of delivery, and fixed the price at $1.35 per bushel," and, for failure to pay the damages thus by the committee ascertained, it was alleged that the complainants feared the board would suspend or expel them from the privileges of membership, etc., and prayed a restraining order, etc. The court says: "The charter undeniably confers the powers the bill alleges appellants fear will be exercised, and which they agreed might be exercised when they became members of the board. It was no doubt intended when these powers were granted that the corporation should have full power to govern its members in all of their dealings with each other on the board. And the power was conferred that all such disputes might be speedily settled by its own tribunal without the delay and expense of litigation in the courts. Hence it was authorized to establish tribunals of its own to avoid litigation and for the prompt and speedy settlement of disputes among its members. One of the prime objects of its creation was to exercise this power. Nor has the power been conferred upon the courts; but by granting it to the corporation it clearly follows that by implication the power was withheld from the courts."

I think the proposition is scarcely debatable that one of the prime objects of the creation of the board of trade was to enable it, by a tribunal of its own, and without resort to the courts, to settle business disputes among its own members, involving money interests and property interests.

It doubtless is true that if the committee had acted in the matters recited in the bill under rules and regulations in contravention of the laws of the land, or had acted willfully in defiance of its own lawful rules, the aid of a court of chancery might be invoked to prevent mischief and fraud. But I am unable to discover the complainant's alleged partiality and injustice of rule 23; nor can I say, from the case presented, that the tribunal organized and agreed upon under section 6 of rule 20, to determine to whom the margin deposits in the defendant bank belonged in whole or in part, willfully or in fact violated any of the rules of the board in refusing to receive, upon the trial of the matter in hearing, evidence respecting the value of short ribs in other markets, or their value for manufacturing or consumptive purposes in the Chicago market, on the day of delivery. On the contrary, I am of the opinion that the only instance in which such evidence would be admissible under the rules of the board, would be in 'a hearing before the board of directors under section 7 of rule 20, for the purpose of determining the amount of margins to be deposited on contracts for future delivery, not yet matured.

In my judgment the only duty devolved upon the committee before whom the complainant appeared, was to determine the ownership of the margin deposits made by the complainant; and in the discharge of that duty the only evidence material was evidence of the goods sold, the selling price and the average market price on the day of maturity of the contract. But however this may be, the court that excluded the evidence complainant offered, is the sole judge of the materiality of that evidence, and its judgment can not be revised here.

While I fully appreciate the ability and learning with which the distinguished counsel for complainant has presented and maintained his contention, I can not avoid the

conclusion that on principle, as well as on the authority of our Supreme Court, by an unbroken line of decisions from its first to its last deliverance upon the subject, this court does not have the power to grant the relief prayed for. People ex rel. Page v. Board of Trade, 45 Ill. 112; Fisher v. Board of Trade, 80 Ill. 85; People ex rel. Rice v. Board of Trade, 80 Ill. 134; Baxter v. Board of Trade, 83 Ill. 146; Sturges v. Board of Trade, 86 Ill. 441; Pitcher v. Board of Trade, 121 Ill. 420.

The temporary injunction will be dissolved, and the bill dismissed for want of equity. The decree of the Superior Court will be affirmed.